UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

| | |
|---|---|
| IN RE CHRISTIE'S DATA BREACH LITIGATION | No. 24-CV-4221 (JMF) |
| *This Document Relates To:*<br>*All Member Cases* | CLASS ACTION |

------------------------------------------------------------------------x

### PLAINTIFFS' SECOND SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THEIR UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Pursuant to this Court's Order of January 28, 2024 [Doc. 55], Plaintiffs submit this second supplemental memorandum of law in support of their Unopposed Motion for Preliminary Approval of Class Action Settlement, and state the following:

**I.   STANDING DOES NOT TURN ON THE THIRD *McMORRIS* FACTOR WHERE THERE ARE PLAUSIBLE ALLEGATIONS OF PRESENT INJURY.**

Plaintiffs here plead two distinct types of injury, both of which support Article III standing. The Court's invocation of the third *McMorris* factor involves only one of those two types of injury - alleged risk of future harm arising from the data breach as a cognizable concrete injury for Article III standing purposes. However, *McMorris* is not applicable to the other type of injury – allegations of actual present misuse arising from this data breach.

The First Circuit's decision in *Webb v. Injured Workers Pharmacy LLC*, 72 F.4th 365 (1st Cir. 2023) is illustrative. In *Webb*, there were two plaintiffs – Webb and Charley. The First Circuit found that Plaintiff Webb had standing to pursue damages because:

> the complaint plausibly alleges a concrete injury in fact as to Webb based on the plausible pleading that the data breach resulted in the misuse of her PII by an unauthorized third party (or third parties) to file a fraudulent tax return.

*Webb*, 72 F.4th at 372–73. The First Circuit went on to note that:

> We hold that the complaint's plausible allegations of actual misuse of Webb's stolen PII to file a fraudulent tax return suffice to state a concrete injury under Article III. This conclusion accords with the law of other circuits. *See, e.g., In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1262 (11th Cir. 2021) (identifying both "identity theft and damages resulting from such theft" as concrete injuries); *Attias v. CareFirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) ("Nobody doubts that identity theft, should it befall one of these plaintiffs, would constitute a concrete and particularized injury.").

*Id.* at 373. *Webb* demonstrates that actual misuse can form the basis for Article III standing without any examination of the third *McMorris* factor.

As stated previously, Plaintiffs Colley and Gaifullin have alleged that they have already suffered from actual misuse of their data that Christie's failed to safeguard. Cybercriminals used Plaintiff Colley's personal information in an attack to hack into his account with his cell phone provider, and cybercriminals used Plaintiff Gaifullin's information to successfully hack into his PayPal account. *See* Plaintiffs' First Amended Consolidated Complaint ("FAC"), ¶¶ 72, 125. Plaintiffs allege that they experienced a variety of other injuries, including increased spam and phishing messages. FAC ¶¶ 54, 71, 90, 107, 125. Additionally, the FAC alleges that the cybercriminals revealed on their Dark Web webpage that they "had already *published and sold* the stolen Private Information." FAC ¶ 36-44. Plaintiff DeJulio has been notified that his Private Information is on the dark web. FAC ¶ 87. As the Eleventh Circuit noted in *Green-Cooper v. Brinker Int'l, Inc.*, 73 F.4th 883, 890 (11th Cir. 2023), *cert. denied sub nom. Brinker Int'l, Inc. v. Steinmetz*, 144 S. Ct. 1457, 218 L. Ed. 2d 689 (2024), the dark web allegations establish "both a present injury—credit card data and personal information floating around on the dark web—and a substantial risk of future injury… ."

In the face of multiple plausible allegations of present injury, the *McMorris* factors – an analytical framework for evaluating whether the alleged risk of future harm constitutes concrete injury -- do not even come into play. This obviates the need for "a declaration addressing the

2

potential for fraud or identity theft resulting from the information exposed in the 2024 data breach." ECF 55 at 2.

## II. STATUTES AND REGULATORY GUIDANCE ESTABLISH THE POTENTIAL FOR FRAUD AND IDENTITY THEFT ARISING FROM STOLEN DRIVER'S LICENSES.

The potential for fraud and identity theft arising from driver's licenses is well-documented in statutes and regulatory guidance. Specifically, the New York State Department of Financial Services ("NYSDFS") issued an insurance industry letter on February 16, 2021, stating it recently learned of a systemic and aggressive campaign to exploit cybersecurity flaws in public-facing websites to steal driver's licenses, and to flag that such information was being used to submit fraudulent claims for pandemic and unemployment benefits.[1] Indeed, "DFS has confirmed that, at least in some cases, this stolen information has been used to submit fraudulent claims for pandemic and unemployment benefits."[2]

Driver's license numbers are also protected information under the Driver's Privacy Protection Act ("DPPA"), 18 U.S.C. §§ 2721, 2724. In an effort to stem the tide of misuses and disclosures of sensitive PII, and in recognition of the sensitivity of drivers' license information (and its utility to identity thieves), Congress passed the DPPA, which restricts access to drivers' license information, and mandates that private companies may only use it for limited, enumerated, purposes. The DPPA specifically defines PII to include driver's license numbers. *See* 18 U.S.C. 2725(3). The DPPA also requires all States to protect the privacy of personal information contained in an individual's motor vehicle record – a record that is accessible if one's driver's license is obtained by bad actors. See 18 U.S.C. 2721(a)(1). This information includes the driver's

---

[1] https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210216_cyber_fraud_alert (last accessed February 4, 2025)
[2] *Id.*

name, address, phone number, Social Security Number, driver identification number, photograph, height, weight, gender, age, certain medical or disability information, and in some states, fingerprints. A stolen driver's license is effectively the "keys to the kingdom" when it comes to sensitive PII that may be used for fraud and identity theft (or worse, as the DPPA was primarily enacted in direct response to a high-profile stalking and murder).

### III. THE GREATER WEIGHT OF AUTHORITY RECOGNIZES THE RISKS OF FRAUD AND IDENTITY THEFT FROM STOLEN DRIVER'S LICENSES.

Other than *Cantinieri v. Verisk Analytics, Inc.*, No. 21-CV-6911 (NJC) (JMW), 2024 WL 5202579 (E.D.N.Y. Dec. 23, 2024), the greater weight of authority recognizes the threat posed by stolen driver's license numbers. *See In re GEICO Customer Data Breach Litig.*, No. 21CV2210KAMSJB, 2023 WL 5524105, at *7 (E.D.N.Y. Aug. 28, 2023); *Stallone v. Farmers Grp., Inc.*, No. 21-CV-01659, 2022 WL 10091489, at *5 (D. Nev. Oct. 15, 2022) (affirming Article III standing in identical data disclosure because the plaintiff "has sufficiently shown that the hacker's intent was not benign, and that the nature of the [information] stolen creates a substantial risk of future harm"); *In re USAA Data Sec. Litig.*, 621 F. Supp.3d 454, 465–67 (S.D.N.Y. 2022); *Rand v. Travelers Indem. Co.*, 637 F. Supp. 3d 55 (S.D.N.Y. 2022).

*Cantinieri* does not stand for the proposition that there is no risk of fraud or identity theft from a compromised driver's license. Instead, the court in *Cantinieri* focused on pleading shortcomings – the lack of "allegations that the disclosure of a driver's license number, name, address, and birthdate, can provide "an opening for fraud" even when no SSN has been disclosed," the lack of allegations of actual identity theft, and the lack of allegations "that the disclosure of a driver's license number is likely to result in identity theft where it alleged that the number was 'used to file fraudulent unemployment claims, open a new account, take out a loan, or commit income tax refund fraud.'" *Cantinieri*, 2024 WL 5202579, at *17 (quoting *USAA Data Security*,

4

637 F. Supp.3d at 67). Here, (as shown above) the FAC makes the actual misuse allegations that the *Cantinieri* court found were missing, and *Cantinieri* (a factual attack on standing) is inapposite.

### IV. CYBER-EXPERTS WARN OF THE THREATS POSED BY STOLEN DRIVER'S LICENSES AND PASSPORT NUMBERS.

While there was not sufficient time under the Court's Order to obtain an expert declaration, the dangers of stolen driver's licenses are well-publicized. Forbes Magazine recently wrote that:

> Hackers harvest license numbers because they're a very valuable piece of information. A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web. On its own, a forged license can sell for around $200.28.[3]

National credit reporting company Experian also states that "Your stolen driver's license number can be the key that helps unlock all sorts of fraud, such as opening financial accounts in your name or creating fake IDs."[4] According to CPO Magazine, which specializes in news, insights, and resources for data protection, privacy, and cyber security professionals,

> To those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation. Tim Sadler, CEO of email security firm Tessian, points out why this is not the case and why these numbers are very much sought after by cyber criminals: " . . . It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks. . . . bad actors may be using these driver's license numbers to fraudulently apply for unemployment benefits in someone else's name, a scam proving especially lucrative for hackers as unemployment numbers continue to soar.[5]

---

[3] Lee Mathews, *Hackers Stole Customers' License Numbers from Geico in Months-Long Breach*, Forbes (April 20, 2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3066c2218658 (last accessed February 4, 2025).

[4] https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/?msockid=3b040ae71892656124ce1f96199b647b (last accessed February 4, 2025)

[5] Scott Ikeda, Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims, CPO Magazine (April 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/ (last accessed February 4, 2025).

Similarly, the U.S. Department of State warns of the dangers of passport fraud, including assuming identities or committing financial crimes and bank fraud.[6]

If a declaration is needed, Plaintiffs request a 21-day extension to obtain one.

Date: February 4, 2025

Respectfully submitted,

*/s/ David Lietz*
David K. Lietz
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Ave. NW, Ste. 440
Washington, D.C. 20015-2052
Tel.: (866) 252-0878
E: dlietz@milberg.com

Jonathan S. Mann
**PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN, P.C.**
2001 Park Place, Ste. 1100
Birmingham, AL 35203
Tel: (205) 322-8880
E: jonm@pittmandutton.com

*Interim Lead Class Counsel for Plaintiffs and the Proposed Class*

---

[6] https://2009-2017.state.gov/m/ds/investigat/c10714.htm (last accessed February 4, 2025)

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 4, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ David Lietz*
Of Counsel for Plaintiffs
